## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| **RICHARD SCOTT DRAUGHON and** | : | **Bankruptcy No. 06-70405 BM** |
| **LYNN L. McDANIEL,** | : | |
| | : | |
| **Debtors** | : | **Chapter 7** |

********************************

| | | |
|---|---|---|
| **SYLVIA ONUSIC,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **Adversary No. 06-7067 BM** |
| | : | |
| **RICHARD SCOTT DRAUGHON and** | : | **Complaint To Determine** |
| **LYNN L. McDANIEL,** | : | **Dischargeability Of Debt** |
| | : | |
| **Defendants** | : | |

Appearances:   Kathleen V. Yurchak, Esquire for Plaintiff
                Joseph F. Gula, III, Esquire for Defendants

### MEMORANDUM OPINION

Sylvia Onusic, plaintiff in this adversary action, seeks a determination that debtors Richard Draughon and Lynn McDaniel owe her a debt in the amount of $138,299.81 which is excepted from discharge by §§ 523(a)(2)(A), (a)(4) or (a)(6) of the Bankruptcy Code.

Debtors deny that they owe plaintiff a debt and, even if they do, maintain that the debt is dischargeable.

We conclude for reasons set forth in this memorandum opinion that debtors owe plaintiff a debt in the amount of $138,299.81 and that the debt is not dischargeable.

## *FACTS*

Plaintiff was married to a former state court judge who was removed from the bench for misconduct and is now deceased.

Defendants Richard Draughon and Lynn McDaniel, debtors in the above-captioned bankruptcy case, are husband and wife.

Plaintiff's residence was encumbered by several mortgages. After she defaulted on one of the mortgages, the mortgagee commenced a mortgage foreclosure action against the property in 1992. To fend off a judgment in foreclosure and a sheriff's sale, plaintiff sought to sell the property.

At some undisclosed time late in 1992, Mr. John Pursley approached plaintiff and her husband and inquired about purchasing the property. Due to a previous bankruptcy, however, Pursley was not able to obtain financing. His attorney, debtor Richard Draughon, and plaintiff's husband began negotiations to surmount this obstacle and to put together an agreement of sale. Debtor Draughon is an experienced attorney with extensive experience in commercial matters.

Plaintiff executed a letter of intent (LOI) on March 8, 1993, wherein she agreed to sell the property[1] to National Lease Management Corporation (NLMC). Because plaintiff was working and studying abroad at the time,[2] her husband executed the LOI on her behalf as her attorney-in-fact. Debtor Draughon executed the LOI on behalf of

---

[1] For reasons that are not material to this adversary action, plaintiff Onusic was the sole owner of record of the property. Her husband had no legal interest in the property.

[2] Debtor lived and worked in Slovenia from 1993 until 1998, at which time she returned to the United States.

- 2 -

NLMC, of which he was the sole shareholder and officer, in his capacity as its president.

He did not execute it on his own behalf.

The agreed-to purchase price of the property was $315,000. The LOI provided

that NLMC would pay the sum of $7,500 at the closing and execute a promissory note in

favor of plaintiff in the principal amount of $307,500 plus interest.

Payments in the amount of $3,000 per month were due for a term of forty-two

months. NLMC first was to apply the payments to existing liens against the property.

Any amount remaining after these payments were made was to be remitted to plaintiff.

The stated maturity date of the note was September 30, 1996. At its option, NLMC could

accelerate the maturity date of the note or extend it to September 30, 1997.

The LOI also provided that the outstanding balance of the note was due as of

the maturity date. NLMC agreed to obtain financing to do so and was permitted to use

the property as collateral. If NLMC was not successful in obtaining financing, it would

execute a second promissory note in the outstanding amount of the first note plus

interest.

Paragraph 13 of the LOI provided as follows:

> Seller shall execute a Deed conveying the Property to Buyers as of
> the Closing Date. Buyer shall hold the Deed(s) in escrow until
> payment of the Promissory Note in full. Upon payment of the
> Promissory Note dated on the date of the Closing in full, Buyer shall
> have the right to record the Deed(s) ....

NLMC then leased the property to John Pursley and his wife for $4,500 per

month. As was the above promissory note, the term of the lease was forty-two months.

- 3 -

NLMC then executed a promissory note ("first note") in the amount of $307,500 plus interest and delivered it to plaintiff on June 1, 1993.  The provisions of the note corresponded to those in the LOI.  Among other things, the note was to expire on September 30, 1996.  Payment in full of the outstanding principal balance was due at that time, unless NLMC elected to extend the maturity date for an additional year.

Neither the LOI nor the first note provided that NLMC's obligation would be secured or collateralized by the property.  Its obligation to plaintiff, in other words, was unsecured.

The closing took place on June 4, 1993, at which time plaintiff executed a deed conveying the property to NLMC.  In accordance with the LOI, NLMC held the deed in escrow pending payment in full of its obligation under the note.  Neither the deed nor the first note was recorded at that time.

John Pursley and his wife executed a document at that time guaranteeing payment of NLMC's obligation under the first note.

During the term of the first note, NLMC made payments to creditors having liens against the property and remitted to plaintiff the remainder of the monthly amount due. Payments, however, were sporadic at best, frequently with intervals of several months between payments.

Because of its tenuous financial situation, NLMC was not able to obtain financing to pay the first note in full and, on August 1, 1997, instead executed a second promissory note (second note) in favor of plaintiff.  Debtor Richard Draughon executed the second

note on behalf of NLMC in his capacity as its president.  The amount due under the

second note was $189,238.75, the amount still outstanding under the first note, plus

interest.  Monthly payments due under the second note totaled $3,901.54.  The maturity

date of the second note was September 30, 2002.

> Paragraph 3 of the second note provided as follows:
>
> This Second Note is executed by National Lease Management Corporation in favor of Sylvia J. Onusic pursuant to Section (8)6.b of that certain letter of intent [RSD93-040A (March 8, 1993)].  That certain promissory note (dated June 1, 1993) in the face amount of $307,500 ("First Note") shall be deemed as paid in full as of August 1, 1997.  This Second Note shall constitute payment of the balance due under the First Note as of August 1, 1997, as determined in accordance with the letter of intent [RSD93-040A (March 8, 1993)].

The second note also stated that in the event it conflicted with the LOI, the

second note took precedence.

As they had done with the first note, John Pursley and his wife guaranteed

NLMC's obligations under the second note.

To induce NLMC to resume making payments to her, plaintiff did not object to

the above provisions of the second note.  She accepted payments from NLMC when

made.

The Pursleys, who continued to reside on the property, entered into another

lease agreement with NLMC on October 1, 1997.  The lease was for a term of sixty

months and called for rental payments in the amount of $4,200 per month.

The deed plaintiff had executed in June of 1993, conveying the property to

NLMC remained in escrow until December 8, 1997, at which time NLMC recorded it.

Plaintiff was not notified that the deed had been recorded and did not learn about it until some time later.

On January 1, 2001, twenty months prior to the specified maturity date of the second note, NLMC executed a third promissory note (third note) in favor of plaintiff in the amount of $110,000 plus interest. Payments due under the note totaled $2,000 per month. The maturity date of the third note was December 31, 2006. Once again, debtor Richard Draughon executed the note on behalf of NLMC in his capacity as it president.

Paragraph 3 of the third note contained language similar to language in paragraph 3 of the second note. It provided that the third note constituted payment in full of the second note.

The third note also provided that in the event it conflicted with the LOI or the second note, the third note would prevail.

In contrast to the first two notes, the Pursleys did not guarantee NLMC's payment of the third note. Shortly after the third note was executed, they stopped paying rent to NLMC pursuant to the lease dated October 1, 2001, and eventually vacated the premises. Debtor Richard Draughon and John Pursley had had a falling out, the details of which are not material to this adversary action.

Payments to plaintiff due under the third note were irregular. NLMC made no payments, for instance, for the months of March, June, July and September of 2001. NLMC's last payment under the third note was made in October of that year.

At some time prior to September 27, 2001, debtor Richard Draughon hit upon the idea of using the equity NLMC had in the property as security for a personal loan to resolve pressing financial problems he and debtor Lynn McDaniel were experiencing. Chief among these was a tax problem with the United States Internal Revenue Service.

To help debtors' resolve their financial problems, NLMC conveyed the property it had purchased from plaintiff to debtors in their individual capacities on September 27, 2001.    Debtors paid no consideration to NLMC for the transfer.    Debtor Richard Draughon executed the deed on behalf of NLMC in his capacity as its president.    The deed was recorded that same day or shortly thereafter.

On September 27, 2001, only nine months after NLMC had executed the third note, debtors borrowed $274,975 from Community Bank of Northern Virginia and, as security for the loan, granted it a mortgage on the property in that amount.    The mortgage subsequently was recorded on October 5, 2001.  Debtors own a residence in Florida which was worth approximately $1,700,000 at that time.  Although there was sufficient equity in the Florida property to collateralize the loan, debtors chose instead to use the property at issue here as security.

Plaintiff commenced an action in state court against debtors and NLMC in February of 2004.  Counts I, II and III of the complaint asserted causes of action against debtor Richard Draughon for common-law fraud, fraudulent transfer and conversion, respectively.  Counts IV, V and VI asserted the same respective causes of action against

debtor Lynn McDaniel.  Count VII asserted a cause of action against NLMC for breach of contract.

Trial of the lawsuit was scheduled to begin on October 27, 2005, but was automatically stayed when debtors filed a voluntary joint chapter 11 petition on October 25, 2005.  The bankruptcy case was dismissed on April 6, 2006, because debtors failed to file a disclosure statement and plan of reorganization by the prescribed deadline.

The state court action against debtors subsequently was rescheduled after dismissal of debtors' first bankruptcy case.  Shortly before it was to be tried, however, debtors commenced the present voluntary joint chapter 11 case on June 12, 2006.  Trial of the state court action once again was automatically stayed.

The schedules accompanying debtors' petition identified assets with a total declared value of $2,308,568.98 and liabilities totaling $ 1,977,568.10.  Debtors' Florida residence and the property at issue here were listed as estate assets.  The former had a declared value of $1,800,000 and was subject to two mortgages totaling $1,260,514.00.  The latter had a declared value of $400,000 and was subject to a mortgage in the amount of $260,000 in favor of Community Bank of Northern Virginia.

Debtors exempted the remaining equity in the Florida property under Florida law as well as the remaining equity in the property at issue here in accordance with § 522 (b)(3)(B).  The amount of exemptions debtors claimed total $679, 485.60.  There were no objections to these exemptions.

A consented-to summary judgment in the amount of $134,425.16 was entered in the state court action in favor of plaintiff and against NLMC on October 17, 2006. Evidence presented in this adversary action indicates that NLMC's assets had a *de minimis* value after the above conveyance to debtors and that the summary judgment therefore probably is not collectible.

Plaintiff commenced this adversary action against debtors seeking a determination that they owe her a debt that is excepted from discharge by § 523(a)(2)(A),(a)(4) or (a)(6) of the Bankruptcy Code. The matter has been tried and is now ready for decision.

## DISCUSSION

The chief purpose of bankruptcy is to provide a "fresh start" for the "honest but unfortunate debtor". *Marrama v. Citizens Bank of Massachusetts*, 127 S.Ct. 1105, 1107 (2007). It is intended to relieve such a debtor from "the weight of oppressive indebtedness and permit him to start afresh". *Boston University v. Mehta (In re Mehta)*, 310 F.3d 308, 311 (3d Cir. 2002). Such relief is not, however, available to a debtor who has engaged in dishonest or other untoward conduct.

Bankruptcy is not only an "ameliorative right" of a debtor; it also provides a remedy for a debtor's creditors. Protecting creditors takes precedence in certain instances over providing a debtor with a fresh start. Accordingly, a debtor may not be permitted in every instance to "escape all financial obligations" by the mere expedient of commencing a bankruptcy proceeding. *Id*.

- 9 -

With certain specified exceptions, an individual debtor's pre-petition debts are discharged. 11 U.S.C. § 727(a), (b).  These exceptions are found at § 523(a) of the Bankruptcy Code.  Subsections 523(a)(2)(A), (a)(4) and (a)(6), upon which plaintiff relies in this adversary action, provide in part as follows:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt --- ....
>    (2) for money, property, [or] services ..., to the extent obtained, by ---
>       (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;...
>    (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny;...
>    (6) for willful and malicious injury by the debtor to another entity or to the property of another entity....

11 U.S.C. § 523(a).

Due to the concern for providing a debtor with a fresh start, exceptions to discharge are construed "narrowly against the creditor and in favor of the debtor". *In re Pelkowski*, 990 F.2d 737, 744 (3d Cir. 1993).

A creditor objecting to the discharge of a debt has the burden of proving by a preponderance of the evidence that an exception to the discharge of a debt applies. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

As we understand it, the gist of plaintiff's § 523(a)(2)(A) action is that debtors committed actual fraud with respect to her.  She does not claim that debtors obtained money, property or services from her by means of a false pretense or a false representation.  Debtors do not deny that this is the gist of plaintiff's § 523(a)(2)(A)

- 10 -

action; they do, however, deny that they committed actual fraud where plaintiff is concerned.

Discussing debtors' defense with respect to plaintiff's § 523(a)(2)(A) claim will help to frame our analysis of the merits of this claim by plaintiff.

In the vast majority of instances, a creditor must establish each of the following to prevail under § 523(a)(2)(A):

> (1) debtor obtained money, property or services from a creditor by a misrepresentation, fraudulent omission or deceptive conduct;
> (2) debtor was aware of the falsity or deceptiveness of the statement or conduct;
> (3) debtor intended to deceive the creditor;
> (4) the creditor justifiably relied on the statement or conduct; and
> (5) the creditor suffered damages that were proximately caused by debtor's statement or conduct.

See *Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 (9th Cir. 2001).

Debtors are correct in asserting that plaintiff has not identified any false representation they made to her. It does not, however, follow from this that plaintiff therefore cannot prevail under § 523(a)(2)(A). The defense they raised to plaintiff's reliance on § 523(a)(2)(A), as just characterized, is wide of the mark. Not every instance of actual fraud for purposes of § 523(a)(2)(A) is based on a misrepresentation.

Congress intended the fullest possible inquiry when it enacted § 523(a)(2)(A) to ensure that all debts arising from fraud are excepted from discharge, "no matter what their form". *Archer v. Warner*, 538 U.S. 314, 321, 123 S.Ct. 1462, 1467, 155 L.Ed.2d 454 (2003).

The most common type of fraud for purposes of this provision involves a deliberate misrepresentation or a deliberately misleading omission. *McClellan v. Cotrell*, 217 F.3d 890, 892 (7th Cir. 2000); also *Mellon Bank, N.A. v Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (6th Cir. 2001). The scope of the term "actual fraud" is not, however, limited to such misrepresentations or omissions. Actual fraud for purposes of § 523(a)(2)(A) encompasses "any deceit, artifice, trick or design involving direct and active operation of the mind which is used to circumvent or cheat another". *McClellan*, 217 F.3d at 893.

As we understand plaintiff's § 523(a)(2)(A) action, she does not maintain that debtor's committed actual fraud by knowingly making a false representation (or omission) with intent to deceive her. While plaintiff grumbled about NLMC's recording of the deed it had agreed to keep in escrow and about the language in the second and third notes stating that each constituted payment in full of the preceding note, these matters do not constitute the primary thrust of her § 523(a)(2)(A) action against debtors.

If these do not constitute the "meat and potatoes" of plaintiff's § 523(a)(2)(A) action, then what does? Plaintiff's action focuses on the conveyance of the property at issue here from NLMC to debtors. This, plaintiff asserts, was the culmination of a scheme debtors devised to cheat her and constituted actual fraud within the meaning of § 523(a)(2)(A).

NLMC was not current on its obligations to plaintiff when the conveyance took place. By then, NLMC had failed to make monthly payments provided for under the third note for the months of March, June, July and September of 2001. These are only the

- 12 -

most recent missed payments and do not constitute the entirety of NLMC's failure to make payments when due.  The last payment NLMC made to plaintiff occurred on October 9, 2001.

Had plaintiff elected to do so, she could have declared a default and accelerated the balance due under the third note.  She also could have brought suit against NLMC and, presumably, would have obtained a judgment in that amount and, upon recording the judgment, acquired a judgment lien against the property.

It is hornbook law that if a judgment debtor conveys real property to a third party after a judgment lien has attached to the property, the lien remains in place and is not affected by the conveyance. 28 Pennsylvania Legal Encyclopedia, Judgment § 317 at p. 390 (2d ed. 2003).  Thus, had plaintiff acquired a judgment lien against the property at issue here, the property would have remained subject to the lien even after it was conveyed to debtors.

Debtor Draughon, an attorney with extensive experience in commercial matters, undoubtedly understood this.  To alleviate their tax problem with the IRS, debtors Richard Draughon and Lynn McDaniel decided to take pre-emptive action against plaintiff. To have equity with which to obtain a loan[3] and hold the IRS at bay, debtors decided that NLMC would convey the property to them without paying any consideration for the transfer before plaintiff took action and acquired a judgment lien against the property.

---

[3.] By the time NLMC conveyed the property to debtors, all liens against the property that were in place when the LOI was executed in March of 1993 had been satisfied.  Debtors took the property "free and clear".

Although debtors' residence in Florida had sufficient equity to secure such a loan, they obviously chose not to do so.

By so doing, debtors undertook to cheat plaintiff by knowingly and intentionally depriving her of an opportunity to take action against NLMC to satisfy the amount owed under the third note. Their machination succeeded. Apart from the real property, NLMC had assets of little or no value upon which plaintiff could levy to satisfy a judgment.

It is not material in our estimation whether plaintiff, who was very quiescent about pursuing NLMC, actively contemplated taking legal action against NLMC when debtors saw to it that NLMC conveyed the property to debtors without them paying any consideration to NLMC for the transfer. The truth remains that debtors acted preemptively to cheat plaintiff by depriving her of the opportunity to take such action. We are not willing to conclude on the basis of the facts presented here that plaintiff "slept on her rights" and therefore has no legal recourse against debtors.

Debtors assert that they did not deprive plaintiff of all opportunity to recover the amount remaining due and owing under the third note. Plaintiff, they maintain, could have gone after the Pursleys, who had guaranteed payment of the first and second notes, and obtained a judgment against them. This assertion lacks merit.

The Pursleys guaranteed payment of the first and second notes. Because of a disagreement between John Pursley and debtor Richard Draughon, however, the Pursleys did not guarantee the third and eventually vacated the premises. Any action plaintiff could have taken against NLMC was based on the third note, not the first and second

notes.  The second note stated that it constituted payment in full of the first note while the third note stated that it constituted payment in full of the second note.  It follows from this that plaintiff had no cause of action against the Pursleys for the outstanding amount due under the third note.[4]

In addition, debtors maintain that plaintiff impermissibly seeks in her § 523(a)(2)(A) action to "stand in the shoes" of NLMC and to recover on its behalf because debtors paid no consideration for the property.  For reasons herein stated, we conclude that debtors' position is without merit.

The long and the short of it are that plaintiff does not seek in this adversary action to recover from debtors *on behalf of NLMC*, she instead seeks to recover from debtors *on her own behalf* for the actual fraud which was described previously and by which she was victimized.  We conclude that plaintiff can recover from debtors on her own behalf for her injury.

In the lawsuit plaintiff had commenced against debtors and NLMC in state court, plaintiff asserted, among other  things, that the conveyance of the property to debtors was in violation of the Pennsylvania Uniform Fraudulent Transfer Act codified at 12 Pa. C.S.A.  § 5101 *et seq*.

NLMC's conveyance of the property to debtors, for which they paid no consideration, unquestionably was fraudulent as to plaintiff under 12 Pa. C.S.A. § 504

---

[4.]  A central tenet of debtors' defense against plaintiff's § 523(a)(2)(A) action is that the second and the third notes constituted payment in full of the note that immediately preceded it.  Debtors have been "hoist with their own petard" and will not be heard to assert the contrary with respect to  the present assertion.

(a)(1). We previously determined in this adversary action that the transfer at issue here was made with actual intent on debtors' part to defraud plaintiff. As a creditor of debtors, plaintiff therefore is entitled to a monetary judgment against debtors as initial transferees of the property in an amount required to satisfy her claim against NLMC. 12 Pa. C.S.A. § 5108(b)(1). From this it follows that debtors owe a debt to plaintiff, a prerequisite to § 523(a), in the outstanding amount owed by NLMC under the third note.

Plaintiff produced evidence at trial establishing that the outstanding principal balance due on the third note is $102,224.44 along with interest due on the date of trial in the amount of $36,075.37. In all, the total amount required to make plaintiff whole is $138,299.81 ($102,224.44 + $36,075.37 = $138,299.81). Debtors have not contested the accuracy of these numbers. Plaintiff therefore is entitled to a judgment against debtors in this total amount.

One final matter remains to be addressed. Debtor Lynn McDaniel asserts that even if a judgment can be entered against debtor Richard Draughon and the debt he owes plaintiff is excepted from discharge by § 523(a)(2)(A), the same is not true for her. Where § 523(a)(2)(A) is involved, she continues, fraudulent conduct by one spouse may not *ipso facto* be imputed to the other spouse. The "sins" of one spouse, in other words, may not be automatically visited upon the other. As support for this proposition, debtor McDaniel points to *In re Carp*, 340 F.3d 15, 26 (1st Cir. 2003). We take no issue with this proposition.

Debtor McDaniel asserts that she was never an employee of NLMC and was not involved in negotiations leading to the LOI or to any of the three promissory notes. Debtor McDaniel also asserts that she had not personally spoken to plaintiff or plaintiff's late husband until after plaintiff commenced the now-stayed state court lawsuit.

Even if we accept these allegations of fact as true, there is reason to conclude that debtor Lynn McDaniel was a participant in the fraudulent scheme detailed previously and therefore also owes plaintiff a debt in the amount of $138,299.81.

At most, the above-recited facts indicate that debtor Lynn McDaniel did not make a fraudulent misrepresentation to plaintiff. While this may be true, it has little or nothing to do with plaintiff's § 523(a)(2)(A) action. As was pointed out, plaintiff primarily alleges that debtors committed actual fraud, as previously characterized, when debtors devised the above stratagem whereby they prevented plaintiff from obtaining a judgment against NLMC and executing on the real property to satisfy the judgment. Plaintiff does not assert that debtors made a fraudulent representation to her.

Debtor Lynn McDaniel, we conclude, knowingly and intentionally participated in this fraudulent scheme. She unquestionably was aware that the IRS might place a tax lien on debtors' residence in Florida, something debtors desperately wanted to avoid. Debtor McDaniel is a college graduate with a B. A. degree in accounting. As such, she undoubtedly understood the economic ramifications for debtors and for plaintiff Onusic of the scheme that had been devised.

- 17 -

Moreover, we have no doubt that she knew of and agreed to the idea that NLMC would convey the property to debtors so that they could use it instead of their Florida residence to secure a loan to hold off the IRS.  After observing her testify at trial, we find it implausible that debtor Lynn McDaniel knew nothing about this plan before the transfer occurred; she was, in other words, not presented with a *fait accompli* after the conveyance from NLMC to debtors occurred.

We have no doubt that, as was just intimated, debtor Lynn McDaniel was aware of the consequences of the conveyance of the real property owned by NLMC to debtors. Debtor Lynn McDaniel realized that a conveyance of the property to debtors would enable them to use the property as collateral to secure a loan.  She also realized that so doing would leave NLMC's unsecured creditors, including debtor, "out in the cold" by depriving them of a means of collecting debts NLMC owed to them and had not paid.  Absent evidence to the contrary, one is presumed to intend all natural and probable consequences of his or her deliberate acts. See *U.S.A. v. Appelwhaite*, 195 F.3d 679, 690 (3d Cir. 1999).

It follows from the foregoing considerations that debtors are jointly and severally liable to plaintiff in the amount of $138,299.81 and that the debt is excepted from discharge by § 523(a)(2)(A) of the Bankruptcy Code.  We need not in light of this conclusion consider whether the debt also is excepted from discharge by § 523(a)4) or § 523(a)(6).

An appropriate order shall issue.

BERNARD MARKOVITZ
U.S. Bankruptcy Judge

Dated: August 21, 2007

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| **RICHARD SCOTT DRAUGHON and** | : | **Bankruptcy No. 06-70405 BM** |
| **LYNN L. McDANIEL,** | : | |
| | : | |
| **Debtors** | : | **Chapter 7** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| **SYLVIA ONUSIC,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **Adversary No. 06-7067 BM** |
| | : | |
| **RICHARD SCOTT DRAUGHON and** | : | **Complaint To Determine** |
| **LYNN L. McDANIEL,** | : | **Dischargeability Of Debt** |
| | : | |
| **Defendants** | : | |

## ORDER OF COURT

**AND NOW**, this 21ˢᵗ day of _August_, 2007, in light of the foregoing, it hereby is **ORDERED, ADJUDGED** and **DECREED** that:

(1) **JUDGMENT** in the amount of $138,299.81 be and hereby is entered **IN FAVOR OF** plaintiff Sylvia Onusic and **AGAINST** debtors Richard Scott Draughon and Lynn L. McDaniel; and

(2) said debt is **NOT DISCHARGEABLE**.

It is **SO ORDERED**.

_____
**BERNARD MARKOVITZ**
U.S. Bankruptcy Judge

cm:  Debtors
James R. Walsh, Esquire
Kathleen V. Yurchak, Esquire
Norma Hilden brand, Esquire o/b/o Office of United States Trustee